UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
---------------------------------------------------------

| | | |
|---|---|---|
| Tyre Martel Smith, | : | CASE NO. 1:04 cv 687 |
| | : | 1:02 cr 505 |
| Plaintiff, | : | |
| | : | |
| vs. | : | Memorandum, Opinion and Order |
| | : | [Resolving Doc. No. 1, 12] |
| United States of America, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On March 24, 2004, *pro se* Petitioner Tyre M. Smith moved the Court, under 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence [Doc. 1]. On May 21, 2004, Respondent United States of America filed an opposition to the motion [Doc. 11]. On July 29, 2004, Magistrate Judge George J. Limbert recommended that the Court deny Petitioner's § 2255 motion and dismiss the motion with prejudice. The Petitioner filed no objection to Magistrate Judge Limbert's Report and Recommendation. Upon its own review of the record, this Court denies Petitioner Smith's claim under § 2255, but modifies the Magistrate Judge's analysis.

I. Background and Facts

On December 17, 2002, the Government charged Petitioner Tyre M. Smith with armed robbery in violation of 18 U.S.C. §§ 2113(a) (d) and 2; using a firearm during a crime of violence in violation of §§ 924(c)(1) and (2); and conspiracy to commit armed bank robbery, in violation of § 371.

Case No. 1:04-cv-687
Gwin, J

The facts relating to these charges arose out of an armed robbery that took place on June 28, 2001, at Metropolitan Savings Bank, located in Euclid, Ohio. According to witnesses who testified on the first day of Smith's trial, Smith and another man, Andrew Hackett, entered the bank at about 11:15am on June 28, 2001. While Hackett stood guard over the lobby area, Smith jumped over the counter and demanded that the employees open the bank vault. Both men had guns.

Smith took four employees to the vault room, which was on the other end of the teller line. He ordered the bank manager, one of the four employees, to open the vault. The bank manager, Lou Catalusci, could not do so because he did not have a key. When Catalusci told the robber as much, Smith struck Catalusci's face with the gun. According to witness testimony, Smith struck him several times, causing Catalusci to bleed profusely.

Subsequently, another of the four employees, Rita Hitselberger, brought the vault keys over from her teller window. She opened the gate to the safe deposit box room, and from there opened the gate to the vault room, which housed several compartments. Once she spun the combination to unlock the currency vault, she informed Smith that the vault had a timer and would only open after fifteen minutes. Smith instructed her to open the adjoining vault, the coin vault, which she began to do. At that point, Smith placed his gun in Hitselberger's ear. She told him to "stop it," and he struck her on the face. She then undid the lock to the second vault. Inside were traveler's checks and coins, which Smith threw to the ground in frustration. He asked the employees to open the safe deposit boxes, which they were unable to do, because the bank had only one of the two keys required to open the boxes, the other key kept by individual customers. Dissatisfied, Smith herded the group back outside of the safe deposit room. After being assured that there was no dye or booby-traps, he then decided to take the cash from the teller

Case No. 1:04-cv-687
Gwin, J

drawers.

While Smith removed the money from the drawers, the employee who had opened the vault, Rita Hitselberger, observed Smith under well-lit conditions from a foot or two away. She noticed that he had a small black tattoo on the back of his neck. According to her trial testimony, she also observed that he had bony elbows and very light skin, that he was slender, and that he wore a tan cap and gold-rimmed glasses. She could not see his hair underneath the cap because his head was covered with a do-rag. She testified that she had several opportunities to get a good look at Smith's face.

Once Smith removed the cash from the drawers and put it in a white mesh bag, he and his partner left the bank. They were inside the bank a total of about 15-20 minutes. A police officer, called to the bank by a customer who had observed the robbery from outside the drive-thru window, was stationed with a canine in a vehicle in the bank's parking lot. Another police officer was stationed in a car across the street.

As the robbers approached the canine vehicle, the first officer, Patrolman Janson, drew his gun and ordered the men to lie down on the ground. Ignoring the instruction, the men started running, fleeing in opposite directions. Smith scrambled over a six-foot wooden fence, throwing over the mesh bag first and dropping his tan cap. Hackett ran the other way, firing gunshots at the police before he fled across an intersection and eventually entered a residential apartment building. Patrolman Janson followed Hackett, who was apprehended inside the building.

Smith was not apprehended that day. After jumping over the fence, Smith ran toward an adjacent gas station, dropped the mesh bag, and ran across the street. The mesh bag was recovered by the customer-witness, Mary Chinchar, who had stayed in her car in the gas station parking lot after calling the

-3-

Case No. 1:04-cv-687
Gwin, J

police. Chinchar observed Smith drop the bag as he was making his getaway. She picked up the bag and took it back to the bank.

About a month after the incident, an FBI agent asked two of the bank employees, independently and on different dates, to identify the bank robber, by showing them a photo lineup. Both independently picked out Smith's photo from the array.

At trial, Rita Hitselberger identified Smith as the robber. At the prosecutor's request, the Court also had Smith turn around and display the back of his neck to the jury. Hitselberger identified the tattoo he displayed as the tattoo she had seen the day of the robbery.

After the witnesses gave testimony and the Government proffered certain exhibits for admission, Smith decided to enter a plea of guilty. His earlier plea, proffered the day before trial, had been rejected by the Court, because Smith would not accept responsibility for carrying a gun during the robbery. On May 1, 2003, the first day of trial, the Court did accept Smith's guilty plea to the offenses charged against him in the indictment. Smith pled guilty to the indictment without a plea agreement.[1]

On July 24, 2003, the Court held a hearing to determine Petitioner's sentence. At the hearing, the Court sustained two of Defendant's objections, granting Smith a 2-point reduction in offense level for acceptance of responsibility, and adding only two – rather than three – points for inflicting bodily harm.

---

[1] During the first plea colloquy, on April 30, Smith agreed to give up his right to appeal his conviction and sentence, but, pursuant to an agreement with the Government, retained his right to appeal punishment in excess of the statutory maximum or that constituted an upward departure, as well as retained his right to appeal a determination of his criminal history category. Smith Plea Colloquy of April 30, 2003, at 17. The initial plea agreement died once the case went to trial. The second plea colloquy, on May 1, did not address whether Smith waived his appeal, and neither party raised the issue. *See* Smith Plea Colloquy of May 1, 2003, at 11.

Case No. 1:04-cv-687
Gwin, J

The Court ruled against Defendant on two other objections: First, the Court added one point for the amount of loss, even though all the stolen money was recovered, because Smith did take the money without intending to return it. Second, the Court found Smith was a criminal history category VI, given the Defendant's past convictions, many of which involved firearms. The Defendant's total offense level was 23, and his Criminal History Category was VI, yielding a sentencing range of 92-115 months.

The Court sentenced Petitioner to 105 months imprisonment on the armed bank robbery conviction, to run concurrent with a 60-month imprisonment term on the conspiracy conviction. The Court ordered Smith to serve the above-mentioned sentences consecutive to an 84-month term of imprisonment on the conviction for using a firearm during a crime of violence. The Court also ordered the Petitioner to serve a five-year term of supervised release and ordered him to participate in drug/alcohol and mental health treatment and pay a $300.00 special assessment fee.

At the sentencing hearing, the Court asked the Petitioner if he wanted to take an appeal. Smith answered in the negative. The Court instructed Smith to contact the Court within five days if he changed his mind. Petitioner never filed a direct appeal from his conviction and sentence. He is currently incarcerated at a federal correctional institution in Adelanto, California.

On March 25, 2004, Petitioner executed the instant § 2255 motion. With this motion, Petitioner raises the following sole ground for relief:

> A. Ground One: Counsel was ineffective when counsel failed to file timely notice of appeal.
>
> Supporting Facts: I asked my court appointed attorney to file the motion or notice of appeal for me and he never did.

Smith Habeas Pet., at 5.

Case No. 1:04-cv-687
Gwin, J

## II. Standard

28 U.S.C. § 2255 provides a post-conviction means by which a federal inmate may collaterally attack his conviction or sentence. *In re Gregory,* 181 F.3d 713, 714 (6th Cir. 1999). Motions brought pursuant to § 2255 are the sole means by which a federal prisoner can collaterally attack a conviction or sentence that he alleges to be in violation of federal law. *See United States v. Davis*, 417 U.S. 333 (1974); *United States v. Cohen*, 593 F.2d 766, 770 (6th Cir. 1979). § 2255 sets forth four grounds upon which federal prisoners may challenge their conviction or sentence:

1. That the sentence was imposed in violation of the Constitution or laws of the United States;

2. That the court was without jurisdiction to impose such sentence;

3. That the sentence was in excess of the maximum authorized by law;

4. That the sentence is otherwise subject to collateral attack.

*United States v. Hill*, 368 U.S. 424, 426-27 (1962); 28 U.S.C. § 2255. Motions to vacate, set aside, or correct a sentence pursuant to § 2255 must be filed in the trial court that sentenced the prisoner. 28 U.S.C. § 2255; *Gregory*, 181 F.3d at 714.

In order to prevail on a § 2255 motion alleging constitutional error, the petitioner must establish that an error of constitutional magnitude existed that had a substantial and injurious effect or influence on the proceedings. *United States v. McNeil*, 72 F. Supp. 2d 801, 803 (N.D. Ohio 1999) (citing *United States v. Watson*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993))). In order to prevail on a § 2255 motion alleging non-constitutional error, the petitioner must establish the existence of a "fundamental defect which inherently results in a complete miscarriage of justice,

Case No. 1:04-cv-687
Gwin, J

or, an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (citing *United States v. Hill,* 268 U.S. 424, 428 (1968)).

### A. Ineffective Assistance of Counsel

As mentioned, Petitioner challenges his incarceration on the sole ground that his counsel provided ineffective assistance in violation of the Sixth Amendment. In order to prevail on his claim of ineffective assistance of trial counsel, Petitioner must satisfy a two-pronged test. First, Petitioner must show that counsel's performance fell below an objective standard of reasonableness, as defined by prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Put another way, counsel's performance is constitutionally ineffective "only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc). The Court accords strong deference to defense counsel's strategic and tactical decisions. *See Strickland*, 466 U.S. at 689.

The Supreme Court has addressed the specific instance of ineffectiveness where counsel fails to file a notice of appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Where, as here, a petitioner alleges ineffective assistance because his counsel failed to file a notice of appeal, the Court must first assess whether counsel in fact consulted with the defendant about an appeal – that is, advised the defendant about the advantages and disadvantages of taking an appeal and made a reasonable effort to discover the defendant's wishes. *Id.* at 478. The Supreme Court stated in *Flores-Ortega*:

If counsel has consulted with the defendant, the question of deficient performance is easily

-7-

Case No. 1:04-cv-687
Gwin, J

> answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary question: whether counsel's failure to consult with the defendant itself constitutes deficient performance.

*Id.* The Supreme Court then outlined the circumstances under which counsel has an obligation to consult with the defendant:

> [C]ounsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known.

*Id.* at 480 (citations omitted). Thus, under the standard laid out in *Flores-Ortega*, the Court must look to the totality of the circumstances to determine whether counsel's failure to consult with the defendant was reasonable.

If the Court determines that counsel's performance was deficient, the Court must then consider the second prong of the *Strickland* inquiry - whether the defendant was prejudiced by counsel's deficient performance. In *Roe*, the Supreme Court held that to show prejudice where counsel failed to file an appeal, "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have appealed." *Id.* at 484. The Court recognized that in some cases, a showing of nonfrivolous grounds for appeal would satisfy both prongs of the *Strickland* inquiry, because it would show both that counsel performed deficiently *and* that the deficient performance prejudiced the defendant. But the Court also stated that the performance and prejudice prongs would not in all cases be coextensive. *Id.* at 486. A defendant may not, for example, be able to

Case No. 1:04-cv-687
Gwin, J

demonstrate any appealable issues. In such a case, where a defendant would rely solely on evidence that he sufficiently conveyed to counsel his interest in appealing, he would need to show additional evidence that, but for counsel's failure, he would have instructed his counsel to appeal. *Id.*

Having outlined the legal standard, the Court now turns to analysis of this case.

### III. Analysis

The Court must first determine whether, in this case, counsel consulted with Petitioner about an appeal. In his habeas petition, Petitioner asserts that he asked his attorney to file an appeal. Petitioner, however, has provided no supporting documents to suggest that he did in fact consult with his attorney. Petitioner's court-appointed trial attorney, John Anthony, has submitted an affidavit stating:

   3. I do not recollect any conversations with Mr. Smith prior to the [sentencing] hearing or during the hearing about Mr. Smith wanting me to file an appeal of his conviction or sentence.

   4. In addition, I have no recollection of Mr. Smith asking me after the hearing was completed to file an appeal on his behalf.

   5. I had no further contact with Mr. Smith after the hearing until several months later at which time I received a letter from Mr. Smith asking whether I filed a notice of appeal on his behalf.

Gov't Exh. A, Affidavit of John F. Anthony. Aside from his bare assertion, Petitioner has failed to provide any supporting facts to suggest that he consulted with his attorney and instructed him to file an appeal on his behalf. Smith mentions no time-frame, method of communication with his attorney, or other circumstances, to raise a disputed issue for resolution. Nor does he provide any sworn affidavit or other documentation. This Court thus credits Attorney Anthony's affidavit and finds that Smith did not consult with his attorney to instruct counsel to file an appeal on his behalf.

Case No. 1:04-cv-687
Gwin, J

Having found the Petitioner did not consult with Attorney Anthony, the Court must then ask the second question required by *Flores-Ortega*: Did Attorney Anthony have an obligation to consult with the defendant about filing an appeal? As mentioned, counsel has a duty to consult "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 480 (citations omitted). In *Flores-Ortega*, the Supreme Court stated:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.

*Flores-Ortega*, 528 U.S. at 480. The Supreme Court also stated that a sentencing court's instructions to a defendant about his appeal rights could suffice to inform the defendant of his rights and might therefore substitute for counsel's duty to consult. *Id.*

In this case, there was no reason to think that a rational defendant would want to appeal. Indeed, the Petitioner himself has not identified a single appealable issue that he would raise on direct appeal. Neither can the Court discern any nonfrivolous appealable issues. Petitioner pled guilty on the first day of trial, accepting responsibility for carrying a firearm during the robbery after several witnesses testified that he had pistol-whipped one of the victims and held the gun to another employee's ear. One employee, Rita Hitselberger, unequivocally identified Smith in court, and identified his tattoo, as well.

Smith pled guilty without a plea agreement. Because he failed to accept responsibility at his plea hearing the day before trial, he lost whatever bargain he may have gotten from the earlier plea agreement

-10-

Case No. 1:04-cv-687
Gwin, J

with the Government, including the right to appeal his criminal history category determination. No such reservation was mentioned during the second plea colloquy or at the sentencing. Nor did Petitioner enter a conditional plea to reserve the right to appeal an adverse determination on any pretrial motion.

Finally, the Court sentenced Smith to 105 months imprisonment, a period in the middle of the 96-115 range available for Offense Level 23, Criminal History Category VI. Even under a Category V score, this term would have been available at Offense Level 23. *See* Sentencing Table (Nov. 1, 2000). Given the extent of Smith's past criminal history, and his history of recidivism, the sentence was a favorable one, the more so because the Court ruled in Smith's favor on two of his objections, thus rejecting the pre-sentence investigation report's recommendation of a higher sentence. Counsel may reasonably have made a calculation that an appeal could put his client in a worse position, should the case be remanded. Given the above, the Court can think of no nonfrivolous issues of appeal available to the Petitioner, and thus no reason to think that counsel should reasonably have known, on that ground, to consult with the defendant.

Of course, a petitioner need not show the existence of nonfrivolous appealable issues where he otherwise demonstrated to counsel his interest in appealing. *Flores-Ortega*, 528 U.S. at 480, 486. Here, however, Petitioner has presented no evidence that he demonstrated his interest in appealing. Indeed, from Petitioner's representations in court, counsel reasonably would have thought that Petitioner did *not* want to appeal. In *Flores-Ortega*, the Supreme Court stated that a sentencing court's instructions to a defendant about his appeal rights could suffice to inform the defendant of his rights and might therefore substitute for counsel's duty to consult. *Id.* at 480.

In this case, the Court very clearly informed Smith of his appeal rights:

[THE COURT:] You may have a right to take an appeal from this. If you don't have

-11-

Case No. 1:04-cv-687
Gwin, J

> enough monies to allow you to prosecute an appeal, you would have the right to have somebody appointed to represent you. Do you want to take an appeal from this?
>
> THE DEFENDANT: No.
>
> THE COURT: Okay. You said no. If you do wish to take any appeal and you change your mind, you would need to let us k now within five days, and if you consult with Mr. Anthony about whether there is any negatives as to taking an appeal, but if you do wish to take an appeal and if you do wish to ask that somebody be appointed to represent you, send a written request requesting the same within five days.
>
> Address that to me at – mail it through the Clerk of Court's Office at 2 South Main, Akron, Ohio 44308. Again, you said you don't want to take an appeal. If I don't hear anything requesting an appeal, I will understand that you will abide by the decision you just expressed, or that you have found other monies available to prosecute an appeal. Unless there is something further, that would be the judgment of the Court.

Sentencing Tr. 27-28. Because, in response to a clear explanation, the Petitioner unequivocally told the Court he did not want to appeal, counsel could reasonably have thought he need not repeat this information to Smith, and that his client did not want to take an appeal. Petitioner has failed to produce any evidence to the contrary. In addition, Attorney Anthony's affidavit suggests that Petitioner did not indicate such an interest before, during, or after the sentencing hearing. Gov't Exh. A, Affidavit of John F. Anthony. Therefore, the Court finds that Petitioner did not reasonably demonstrate his interest in appealing, and thus that counsel had no constitutionally-imposed duty, based on that ground, to consult with his client about an appeal.

The Court thus finds that counsel's performance was not deficient. Because the Court finds that Petitioner has not met his burden on *Strickland*'s first prong, it need not reach the prejudice prong. The Court notes, however, that even were it to find counsel's performance deficient, the Petitioner would not meet his burden to show prejudice. As mentioned, Petitioner has identified no appealable issues he would

-12-

Case No. 1:04-cv-687
Gwin, J

raise on a direct appeal. Thus, according to *Flores-Ortega*, he would have to provide additional evidence that, "but for counsel's deficient conduct, he would have appealed." 528 U.S. at 486; *see also id.* (stating that a defendant need not specify appealable issues if "there are other substantial reasons to believe that he would have appealed"). Petitioner has proffered no such evidence.

The Court concludes that Petitioner has suffered no Sixth Amendment violation.

### IV. Conclusion

For the foregoing reasons, the Court DENIES Tyre Smith's motion to vacate, set aside, or correct his sentence under § 2255.

IT IS SO ORDERED.


Dated: April 29, 2005                    s/  *James S. Gwin*
                                         JAMES S. GWIN
                                         UNITED STATES DISTRICT JUDGE